IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| LEANDER INDEPENDENT SCHOOL DISTRICT, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | |
| DEPARTMENT OF THE INTERIOR; UNITED STATES FISH AND WILDLIFE SERVICE; DEB HAALAND, in her official capacity as Secretary of the United States Department of the Interior; MARTHA WILLIAMS, in her official capacity as Principal Deputy Director of the United States Fish and Wildlife Service; and AMY LUEDERS, in her official capacity as Southwest Regional Director of the United States Fish and Wildlife Service, | § § § § § § § § § § § § § § § § | Civil Action No. 1:22-cv-310 |
| *Defendants.* | § § § | |

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

## I.   INTRODUCTION

1.     This case involves the abuse of an administrative process whereby the U.S. Fish and Wildlife Service (the "Service") is required to issue incidental take permits under section 10(a)(1)(B) of the Endangered Species Act ("ESA") to non-federal applicants that meet specific statutory criteria. These incidental take permits authorize non-federal applicants to "take" ESA-listed species in connection with otherwise lawful activities where such activities are reasonably certain to result in such "take." The applicant seeking an incidental take permit in this case is Plaintiff, the Leander Independent School District (the "School District"), a large Texas school

district in the Austin metropolitan region. For some five years, the School District has been earnestly seeking an ESA permit ("Permit") to allow species "take" that may be caused by the construction and operation of an approximately one-mile, two-lane second roadway access ("Project") to an existing combined high school and middle school campus ("Campus") serving more than 4,000 students, faculty, and staff. The Project is critical to the health and safety of the students and faculty and to the efficient operation of the Campus.

2.      The Service has thrown up repeated roadblocks to the School District's efforts to obtain the authorization allowing for construction of the Project. The Service has alternated between urging the School District to enroll in the existing Balcones Canyonlands Conservation Plan take permit held by the City of Austin and Travis County, which such entities rejected, and egregiously delaying action on the School District's application ("Application") for the Permit in connection with the Project. This process has now culminated in the Service refusing to further process the School District's Application unless the School District first exercises its power of condemnation to gain control of the small amount of property needed for the Project. The plainly stated position of the Service, contrary to law and logic, is that the School District must condemn the land before the Service processes the School District's Application. However, without the Permit, the School District would have no use for the land. Ultimately, of course, this case is not about the relative merits of and needs for the School District's proposed access road. Likewise, it is not about why the School District did not seek to build the Project when it first built the Campus. It is not even about the failure of the Service to work cooperatively with the School District to address a real risk posed to the health and safety of school children. Rather, it is simply about the Service's failure to comply with the law in processing and reaching a decision on the School District's Application. Legally, the failure

would be the same regardless of what person or entity was seeking the Permit or for what purpose. By refusing to complete processing the School District's Application, Defendants have either unlawfully denied the Application or, in the alternative, unreasonably delayed processing of the Application, leaving the School District no option but to seek redress in this Court.

3.      The School District requests this Court order, declare, and adjudge that Defendants have violated the ESA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, vacate the de facto denial of the Application, and compel Defendants to reconsider their de facto denial of the Application or, alternatively, compel Defendants to take final action on the Application.

## II.    JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (actions arising under the laws of the United States); 5 U.S.C. §§ 702-703 (actions arising under the APA); and 16 U.S.C. § 1540(c) (actions arising under the ESA).

5.      By providing its written refusal to process the School District's Application, Defendants have effectively denied the Application, resulting in final agency action challengeable under the APA. 5 U.S.C. § 704.

6.      Alternatively, by delaying and refusing to complete processing the Application, Defendants have unlawfully withheld or unreasonably delayed taking action on the Application, which is reviewable pursuant to 5 U.S.C. §§ 702, 706(1).

7.      In de facto denying the Application by refusing further processing, Defendants have further violated 16 U.S.C. § 1539(a)(2)(B), which mandates the Service "shall issue" an incidental take permit where statutory issuance criteria have been met. The ESA expressly provides that a person may commence a civil suit to enjoin any person, including federal

agencies, "alleged to be in violation of any provision of [the ESA] or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A).

8.     An actual controversy exists therefore between the parties within the meaning of the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a), 2202.

9.     On January 24, 2020, the School District provided Defendants notice of its intent to file this action, pursuant to 16 U.S.C. § 1540(g)(2)(C). A true and correct copy of the School District's Notice of Intent to File Suit Concerning the De Facto Denial of an Incidental Take Permit Application under the Endangered Species Act ("60-day Notice") is attached as Exhibit A and incorporated by reference into this Complaint.

10.    Venue in this judicial district is proper under 28 U.S.C. § 1391(e)(1), because a substantial part of the events or omissions giving rise to the claim occurred in this district and in the State of Texas.

## III.   PARTIES

11.    Plaintiff Leander Independent School District is in Travis and Williamson Counties, Texas, serving more than 42,000 students across 44 campuses. The School District is duly authorized under the laws and regulations of the State of Texas and has standing to bring this suit. *See, e.g.*, Tex. Const. art. VII, § 1; *In re S.C.*, 229 S.W.3d 837, 842 (Tex. App. 2007).

12.    As an independent school district in the State of Texas, the School District is governed by a board of trustees ("Trustees") charged with overseeing the management of the District. Tex. Educ. Code § 11.051. An independent school district "may, by the exercise of the right of eminent domain, acquire the fee simple title to real property on which to construct school buildings or for any other public use necessary for the district." *Id*. § 11.155(a). The Trustees of a Texas independent school district constitute a body corporate with the capacity to

hold real and personal property and to sue and be sued under Texas Education Code section 11.151(a).

13.     Section 4.001(b) of the Texas Education Code states that among the objectives of public education is that school campuses "maintain a safe and disciplined environment conducive to student learning." *Id*. § 4.001(b), Objective 8; *see also* Title 2, Subtitle G of the Texas Education Code. In connection with maintaining safety and order in its schools, the School District determined that construction of a second point of ingress and egress (the "Project") to a joint middle school and high school campus was necessary to further the safety of students, faculty, and staff using the Campus by mitigating the risk associated with a catastrophic wildfire, active shooter events, and other emergencies, and to provide for greater safety of students, faculty, and staff as they travel to and from the Campus on a daily basis.

14.     To ensure compliance with the ESA, the School District prepared a habitat conservation plan ("HCP") and submitted the Application to the Service. The School District has expended hundreds of thousands of dollars to prepare the HCP, to negotiate with the Service on appropriate conservation measures to be included in the HCP and on other issues, and to attempt to persuade the Service to process the Application. The refusal of the Service to process the Application and make a clear affirmative determination frustrates the mission and statutory directive of the School District to provide a safe learning environment for its students, faculty, and staff. Consequently, the Service's unlawful action has resulted in harm to the School District that is ongoing. A favorable ruling by this Court may redress this harm.

15.     Defendant Department of the Interior ("Interior Department") is an agency of the United States charged with administering the ESA regarding terrestrial and freshwater species and resources.

16.     Defendant the Honorable Deb Haaland ("Secretary") is being sued by the District in her official capacity as Secretary of the United States Department of the Interior. Congress delegates to the Secretary certain responsibilities for the Interior Department's implementation and administration of the ESA. The Secretary's responsibilities include administering the ESA for the benefit of species and the public. The Secretary is required to issue incidental take permits under ESA section 10 where the permit application meets statutorily defined issuance criteria. 16 U.S.C. § 1539(a)(2)(B).

17.     Defendant United States Fish and Wildlife Service is an agency within the Interior Department that has the delegated responsibilities of administering and implementing the ESA, including provisions concerning processing and issuance of incidental take permits under 16 U.S.C. § 1539.

18.     Defendant Martha Williams is being sued in her official capacity as Principal Deputy Director ("Director") of the Service. The Secretary delegates most of her ESA authority to the Director who is responsible for processing and issuance of incidental take permits under 16 U.S.C. § 1539.

19.     Defendant Amy Lueders is being sued in her official capacity as the Southwest Regional Director ("Regional Director") of the Service. The Director delegates most of her ESA authority to the Regional Director, who is responsible for processing and issuance of incidental take permits under 16 U.S.C. § 1539.

## IV.    STATUTORY FRAMEWORK

20.     Congress enacted the ESA "to provide a program for the conservation of . . . endangered species and threatened species." 16 U.S.C. § 1531(b).

21.     ESA section 9 prohibits unauthorized "take" of species listed as endangered thereunder. 16 U.S.C. § 1538.

22.     ESA section 4(d) authorizes the Secretary to extend the prohibitions of ESA section 9 to species listed as threatened. 50 C.F.R. § 17.31.

23.     "Take" is defined as to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

24.     Pursuant to ESA section 10(a)(1)(B), Congress authorized the Secretary to issue permits to applicants authorizing take where "such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).

25.     No permit under ESA section 10(a)(1)(B) may be issued unless an applicant "submits to the Secretary a conservation plan that specifies—(i) the impact which will likely result from such taking; (ii) what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps; (iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and (iv) such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan." 16 U.S.C. § 1539(a)(2)(A). A permit issued under ESA section 10(a)(1)(B) is typically referred to as an "incidental take permit" or "ITP." A conservation plan submitted in connection with an ITP application is typically referred to as a "habitat conservation plan" or "HCP."

26.     ESA section 10(a)(2)(B) provides that if the Secretary finds, after opportunity for public comment, that an ITP application meets the following statutory issuance criteria ("Permit Issuance Criteria"), the Secretary "shall issue" the permit:

(i) the taking will be incidental;

(ii) the applicant will, to the maximum extent practicable, minimize and mitigate

the impacts of such taking;

(iii) the applicant will ensure that adequate funding for the plan will be provided;

(iv) the taking will not appreciably reduce the likelihood of the survival and

recovery of the species in the wild; and

(v) the measures, if any, required under subparagraph (A)(iv) will be met; and

he has received such other assurances as he may require that the plan will be

implemented.

16 U.S.C. § 1539(a)(2)(B).

27.     The Service's ESA implementation regulations with respect to permit issuance

do not differ materially from the ESA's Permit Issuance Criteria. *See* 50 C.F.R. § 17.22(b)(2).

28.     Where the Service denies an application for a permit within the agency's

jurisdiction, relevant regulations require an applicant complete an administrative appeals

process. 50 C.F.R. § 13.29.

29.     An applicant whose permit has been denied in writing by the Service may

request reconsideration by the agency by submitting a written, signed request to the Service

within 45 calendar days of the date of notification of a denial by the Service. *Id*. at (a)-(b).

30.     If the Service denies an applicant's request for reconsideration of a permit denial,

an applicant may submit a written appeal to the Service's regional director in the region where

the issuing office is located. *Id*. at (e). The decision of a regional director relative to an

applicant's written appeal "shall constitute the final administrative decision of the [Interior

Department]." *Id*. at (f)(3).

## V.    FACTS REGARDING THE SCHOOL DISTRICT'S APPLICATION FOR AN INCIDENTAL TAKE PERMIT

31.    The Campus, which includes the School District's Four Points Middle School and Vandegrift High School, is located in the City of Austin, Travis County, Texas.

32.    The Campus serves more than 4,000 students, faculty, and support staff, is surrounded on three sides by development, and partially abuts an area set aside to preserve several ESA-listed species.

33.    The Campus has only one point of ingress and egress—via a highly congested intersection at McNeil Drive and Ranch to Market Road 2222.

34.    The need for more than one point of ingress and egress is especially important for the Campus, which backs up to the Balcones Canyonlands Preserve ("Preserve")—a large preserve managed for federally-listed endangered and threatened species—which is susceptible to catastrophic fires similar to the one that recently roared through a Denver suburb in a matter of minutes.

35.    In 2011, a wildfire in the Steiner Ranch development near and served by the Campus burned 160 acres, destroyed 23 homes within a neighborhood abutting the Preserve, and created a 2-hour traffic jam on the only road out of the affected neighborhood. Four Points Middle School served as an evacuation shelter during this fire.

36.    Considering the foregoing, the School District has determined that the Project—a second access road to the Campus—is critical to ensure public safety both during routine school operations and during emergencies such as fires, spills, and active shooter events.

37.    The proposed Project is an approximately 5,400'-long, two-lane road extending from the current terminus of Tech Trail near the intersection of River Place Boulevard and Four

Points Drive and would be constructed and operated within a 100'-wide permanent right-of-way.

38.     The placement of the Project within the 420'-wide infrastructure corridor and even within the expected 100'-wide right-of-way has not been finalized and will likely continue to be adjusted during the Permit process in order to minimize potential impacts to listed species and generally to the human environment.

39.     Most of the proposed right-of-way would be located within an existing 420'-wide "primary infrastructure corridor" that crosses through the edge of the preserve system of the Balcones Canyonlands Conservation Plan ("BCCP"). In 1996, the Service approved the BCCP and issued an incidental take permit to Travis County and the City of Austin. A map of the Project, including the relevant portion of the BCCP infrastructure corridor, is attached to this Complaint as Exhibit B and is incorporated by reference.

40.     Infrastructure corridors were designated within the preserve system under the BCCP "where concentrated linear routing is preferred for roads, electric services, gas . . ." and other facilities. BCCP at 2-55. Appendix B to the BCCP provides as an example of "facilities which will be constructed along infrastructure corridors" the construction of "easements and right-of-ways . . . for roads." BCCP Appendix B at 1.

41.     The BCCP primary infrastructure corridor in question currently holds several electric transmission lines, water lines, and rough access roads and was designed specifically to receive infrastructure needing to cross the Preserve.

42.     In connection with the Service's issuance of the incidental take permit to the City of Austin and Travis County, the Service considered the listed species habitat within the infrastructure corridor to be fully impacted (e.g., of no conservation value to the listed species

covered by the BCCP), and those impacts—including impacts associated with potential future widening of the infrastructure corridors—were mitigated by the City of Austin and Travis County pursuant to the terms of the BCCP. *Id*. at 3.

43.    Travis County owns or otherwise controls a portion of the future Project right-of-way.

44.    Travis County is opposed to the Project's placement within the BCCP infrastructure corridor, incorrectly arguing that the corridor was for utilities, but not roadways.

45.    Pursuant to the BCCP and the related ITP, the County and the City of Austin are authorized to allow projects within the County to receive incidental coverage through the BCCP where project proponents apply for coverage and agree to certain terms and conditions.

46.    The School District requested incidental take authorization through the BCCP and was informed such authorization would not be granted.

47.    The School District has the full power of eminent domain, which, as necessary, may be used to condemn all or a portion of the required right-of-way. Tex. Educ. Code § 11.155(a).

48.    Construction and operation of the Project has the potential to result in incidental take of two species listed under the ESA: the golden-cheeked warbler and the Jollyville Plateau salamander.

49.    Because of the potential for take of listed species, the School District began coordinating with the Service's Austin Ecological Services Field Office regarding the preparation of an HCP as early as 2013 to support the School District's Application for the Permit under ESA section 10.

50.     After years of coordination with the Service, the City of Austin, and Travis County, and submission of multiple draft HCPs to the Service for review and comment, the School District submitted its formal Application to the Service on June 16, 2016. The Application was accompanied by the previously negotiated HCP.

51.     Eight months after the School District submitted the Application, on February 14, 2017, the Service provided comments in the form of a "preliminary review," and requested the School District provide information relating to HCPs and ESA section 7 consultations covering lands within and adjacent to the proposed right-of-way for the Project, all of which were previously approved or issued by the Service. Information requested of the School District was in the Service's own files. Nevertheless, the Service required the School District to submit a Freedom of Information Act ("FOIA") request to the Service to obtain documents in the Service's possession that included the information sought by the Service. The School District submitted a FOIA request, obtained the requested records from the Service, and provided the Service with the records received from the agency pursuant to the FOIA request.

52.     In May 2017, the School District responded to the Service's "preliminary comments" on the HCP, including information on lands purchased with ESA section 6 grant funds, information on potential karst features within the HCP plan area, information concerning impacts on ESA habitat preserve land, information concerning additional mitigation that would be provided by the School District to offset any potential impacts to Preserve lands, and information concerning salamander conservation funding. On December 13, 2017, a former Texas State Administrator for the Service provided his professional opinion that the HCP, as would be revised based on the School District's response to comments, met the Permit Issuance Criteria. A copy of that opinion is attached hereto as Exhibit C and is incorporated by reference.

53.     On July 10, 2017, the School District submitted to the Service a revised HCP, which incorporated the changes described in the School District's May 2017 response to the Service's comments. The School District also submitted additional information to the Service in support of the Application.

54.     Subsequent to the July 10, 2017 submittal, the Service and the School District held five meetings or teleconferences to seek resolution of the Service's remaining concerns, the School District provided a letter to the Service's Assistant Regional Director proposing resolution to remaining issues on the HCP, and the School District ultimately submitted another revised HCP on June 13, 2018.

55.     In November 2018, the Service provided additional comments and requested additional revisions to the revised HCP, and the School District submitted a revised HCP.

56.     On May 9, 2019, the Service failed to attend a call the agency had scheduled with the School District to discuss the HCP.

57.     On July 10, 2019, the Service delivered to the School District a letter ("2019 Letter") stating the agency would not process the Application until the School District acquired from Travis County and others legal ownership or control of the land required for the Project. A copy of the 2019 Letter is attached to this Complaint as Exhibit D and is incorporated by reference.

58.     The Service also informed the School District of the agency's refusal to process the Application by phone on July 10, 2019. In that teleconference, the Service informed the School District that the issue of ownership and control of the HCP plan area was the sole issue remaining.

59.     The Service's 2019 Letter states that Service guidance prohibits the agency from issuing an ITP where an applicant (here, the School District) does not own or otherwise control the HCP plan area.

60.     On August 23, 2019, the School District provided to the Service a written explanation of why the Service's position concerning ownership or control of the right-of-way was legally incorrect and urged the Service to reconsider its refusal to process the Application. The School District's August 23, 2019, letter is attached to this Complaint as Exhibit E and is incorporated by reference.

61.     The Service responded on September 11, 2019, that the agency would not process the Application unless and until the School District has acquired or otherwise proves its legal control over the right-of-way. The Service's September 11, 2019, letter is attached to this Complaint as Exhibit F and is incorporated by reference.

62.     On the belief that the Service's continued refusal to process the Application constituted a de facto denial of the same, the School District exhausted the administrative appeals process required by the Service's regulations in connection with permits denied by that agency. 50 C.F.R. § 13.29.

63.     The School District delivered to the Service on October 17, 2019, an official request for reconsideration pursuant to 50 C.F.R. § 13.29(a). A copy of the School District's request for reconsideration is attached to this Complaint as Exhibit G and is incorporated by reference.

64.     The Service responded by letter on October 24, 2019, that the agency had not, in fact, denied the Application and refused to render a decision on the request for reconsideration.

A copy of the Service's response is attached to this Complaint as Exhibit H and is incorporated by reference.

65.     On November 14, 2019, the School District submitted to the Service a formal appeal of the Service's Application denial ("Formal Appeal") pursuant to 50 C.F.R. § 13.29(e). A copy of the Formal Appeal is attached to this Complaint as Exhibit I and is incorporated by reference.

66.     On January 24, 2020, having received no response from the Service concerning the Formal Appeal, the School District provided to Defendants the 60-day Notice.

67.     On February 27, 2020, the School District received the Service's response to the Formal Appeal, which was dated February 19, 2020 ("Response to Formal Appeal"). In its Response to Formal Appeal, the Service again indicated it had not denied the School District's Application. The Service also indicated the Formal Appeal did not "provide new information to change [the Service's] previous understanding that [the School District] has not acquired legal authority to execute a project on the lands proposed for HCP coverage." A copy of the Service's Response to the Formal Appeal is attached to this Complaint as Exhibit J and is incorporated by reference.

68.     The School District is an independent school district in the State of Texas with the power of eminent domain to acquire fee simple title to real property on which to construct school buildings or for any other public use necessary for the School District. Tex. Educ. Code § 11.155.

69.     Neither the ESA's Permit Issuance Criteria nor the Service's ITP regulations require an applicant, at the time of an incidental take permit application, to have the legal authority to execute a project on lands included in an HCP.

70.     The Service has, on myriad occasions, issued ITPs to entities with the power of eminent domain who, at the time an application is submitted, do not own, control, or otherwise have legal authority over lands to be included in an HCP. Following are examples of ITPs issued within the Service's Southwest Regional Office (which includes the Austin Ecological Field Services Office) whereby the permittee under the ITP did not have ownership, control, or legal authority over HCP lands at the time the ITP was issued:

- ***TransCanada Keystone Pipeline, LP (Oklahoma Office, Permit No. TE-80492A, 2012).*** Authorized take in connection with construction of a pipeline. Applicant did not own or control all of the right-of-way at the time the permit was issued but possessed the power of eminent domain.

- ***West Travis County Public Utility Agency Raw Water Transmission Main (Austin Office, Permit No. TE-62866C-0, 2018).*** Authorized take in connection with construction of raw water transmission main to be partially located within listed species preserve established pursuant to a previously issued ITP held by a separate public entity. At the time the ITP was issued, the parties had not yet agreed to the terms of an easement. The HCP associated with that ITP explained that clearing and construction of the water main would not occur until the parties had come to an agreement.

- ***LCRA Transmission Services Corporation Competitive Renewable Energy Line Projects (Austin Office, Permit No. TE-46542A, 2010).*** Authorized take in connection with two transmission line projects. Not all rights-of-way had been acquired at the time the permit was issued and there was organized opposition to the transmission lines.

71.     Should the School District elect not to exercise its right to condemn the Project right-of-way or fail to succeed in a condemnation proceeding, there will be no take associated with the Project and, thus, the take of ESA-listed species authorized by any ITP would not occur.

72.     The Service's refusal to either approve or formally deny the School District's Application appears designed to deprive the School District of the opportunity to obtain judicial review.

73.     This is not the first time the Service's Austin Ecological Services Field Office, within the Service's Southwest Region, has been made to answer in this Court for its refusal to complete processing an ITP application.

74.     In 1999, the U.S. District Court for the Western District of Texas held that statements by the Service that an ITP application, in its then-current form, would not be granted constituted a de facto denial of the same. *GDF Realty, Ltd. v. United States*, Case No. 1:98-cv-00772-SS (June 7, 1999) ("*GDF Realty*"). Plaintiffs in *GDF Realty*, like the School District, had sought and been denied incidental take authorization under the BCCP. A copy of *GDF Realty* is attached to this Complaint as Exhibit K and is incorporated by reference.

75.     In *GDF Realty*, this Court observed that "[p]rotracted inaction, as is apparent on the record before the Court, is action under the law," that the Service "acted totally irresponsibly in this matter," and that forcing plaintiffs "into economic damage by intentionally delaying a ruling on their applications, a ruling to which they are legally entitled, is simply wrong." *Id*. at *5-6. Ultimately, this Court stated that plaintiffs were "entitled to challenge that determination through judicial review, and the [Service's] intentional delay has denied them that right." *Id*. at *6.

-17-

## VI.   SPECIFIC ALLEGATIONS THAT SUPPORT DECLARATORY AND INJUNCTIVE RELIEF

76.     The School District hereby alleges and incorporates by reference the allegations contained in Paragraphs 1 through 75 as though fully set forth herein.

77.     An actual and substantial controversy exists between the School District and Defendants over Defendants' de facto denial and, alternatively, Defendants' unreasonable delay in processing of an Application that met the statutory issuance criteria set forth in section 10 of the ESA. 16 U.S.C. § 1539(a)(2).

78.     This case is currently justiciable because Defendants have failed to follow the ESA and its implementing regulations in de facto denying the Application, and, alternatively, unreasonably delaying processing of the Application, and Defendants have provided the School District written indication that Defendants will continue to de facto deny and unreasonably delay processing the Application. 16 U.S.C. § 1539(a)(2)(B).

79.     Declaratory and injunctive relief is, therefore, appropriate to resolve this controversy.

## VII.   FIRST CLAIM FOR RELIEF (VIOLATION OF THE APA, 5 U.S.C. § 706(2); DENIAL OF THE APPLICATION WAS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, AND OTHERWISE NOT IN ACCORDANCE WITH THE LAW)

80.     The School District realleges and reasserts Paragraphs 1 through 79 as though set forth in full in each and every allegation of this claim.

81.     Defendants' written refusal to process the Application constitutes a final agency action that is arbitrary, capricious, and otherwise not in accordance with law.

82.     The Service's 2019 Letter was unequivocal that no ITP would be issued on the School District's Application unless the School District obtained ownership or control of the right-of-way, which the School District has indicated is not timely.

83.     Upon receipt of the Service's 2019 Letter, which included the agency's written refusal to process the Application, the School District adhered to the Service's administrative appeals process required when the Service denies an application for a permit as set forth in 50 C.F.R. § 13.29, and received written confirmation from Defendants at each step of the administrative appeals process that Defendants would not issue the requested Permit and would not take additional steps to complete processing the Application. The School District thereby exhausted any administrative remedies available to it in connection with the Service's refusal to process the Application.

84.     Defendants' unequivocal, written refusal to issue the Permit despite numerous attempts by the School District to move Defendants from their position represents a de facto denial of the School District's Application and, thus, constitutes final agency action subject to review under 5 U.S.C. § 706(2).

85.     ESA section 10(a)(2)(B) states that where an application for an ITP meets the Permit Issuance Criteria, the Secretary "shall issue the permit." 16 U.S.C. § 1539(a)(2)(B).

86.     The Permit Issuance Criteria do not include a requirement that a local governmental entity own or control all areas to be included in an ITP at the time an application for an ITP is submitted.

87.     Defendants' de facto denial of the Application is based solely on the fact that the School District does not own or control portions of the proposed right-of-way located on lands owned or controlled by Travis County.

88.     Defendants' de facto denial of the Application is arbitrary, capricious, an abuse of discretion, and contrary to law because the de facto denial was based on factors Congress has not intended Defendants to consider, entirely failed to consider an important aspect of the

problem, offered an explanation for the de facto denial that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## VIII.   SECOND CLAIM FOR RELIEF (VIOLATION OF THE APA, 5 U.S.C. § 706(1); UNLAWFULLY WITHHOLDING AND UNREASONABLY DELAYING TAKING ACTION ON THE SCHOOL DISTRICT'S INCIDENTAL TAKE PERMIT APPLICATION)

89.     The School District realleges paragraphs 1 through 88 as though set forth in full in each and every allegation of this claim.

90.     Even if Defendants' written refusal to further process the Application does not constitute a de facto denial of the same, Defendants have unlawfully withheld and unreasonably delayed taking action on the Application, which has now languished for five years.

91.     Defendants have a continuing mandatory duty to administer the ESA, including processing incidental take permits pursuant to ESA section 10.

92.     Defendants have no authority under the ESA to refuse to process an application for an incidental take permit, yet they have over the course of years delayed taking final action on the Application and, most recently, have repeatedly stated in writing that they will withhold taking any action on the Permit whatsoever until the School District meets a criterion not required under section 10 of the ESA.

93.     As a result of Defendants' pattern of noncompliance, including its written refusal to process the Application, Defendants have failed to take a discrete action—issuing or denying the Permit—required under ESA section 10.

94.     The ESA does not contemplate that Defendants may simply refuse to process an application that purportedly does not meet the standards that are required under ESA section 10;

rather, Defendants' remedy for an incidental take permit application that purportedly does not meet the requirements of the ESA is to deny the application.

95.     Defendants' refusal to process the Application is an attempt to avoid a final agency action that is subject to review under 5 U.S.C. § 704. *GDF Realty* at *5-6; *see U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 578 U.S. 590 (2016); *see also* 5 U.S.C. § 706(2).

96.     Defendants' affirmative, written refusal to process the Application constitutes a discrete "agency action unlawfully withheld or unreasonably delayed" and is therefore actionable pursuant to the APA. 5 U.S.C. § 706(1).

## IX.    THIRD CLAIM FOR RELIEF (VIOLATION OF THE ESA, 16 U.S.C. § 1539)

97.     The School District realleges and reasserts Paragraphs 1 through 96 as though set forth in full in each and every allegation of this claim.

98.     ESA section 10 does not contemplate that the Service has the authority to refuse to process an application for an incidental take permit; rather, ESA section 10 provides the parameters upon which Defendants are required to issue or deny an application.

99.     Similarly, Defendants are not empowered to deny an incidental take permit application based on failure to meet criteria that Congress has not provided or that Defendants have failed to promulgate pursuant to duly issued regulations.

100.    Through the School District's 60-day Notice, Defendants were made aware of their obligation to complete processing the Application.

101.    More than 60 days have passed since Defendants' receipt of the 60-day Notice, and as a result, the School District is entitled to ask this Court to enjoin Defendants from continuing to violate their duty to process the Application. 16 U.S.C. §§ 1539(a)(2)(B), 1540(g)(1)(A).

X.      **PRAYER FOR RELIEF**

WHEREFORE, the School District prays for judgment from this Court as follows:

1.      Declare Defendants have de facto denied the Application;

      a.   Declare Defendants have violated the ESA and APA by de facto denying the Application; and

      b.   Vacate Defendants' de facto denial of the Application;

2.      In the alternative, declare Defendants have violated the ESA and APA by unreasonably withholding and unlawfully delaying a decision on the School District's Application;

      a.   Enjoin Defendants from continuing to violate the ESA and APA in this manner;

      b.   Compel Defendants to complete processing the Application;

3.      Retain jurisdiction over this matter until such time as Defendants have fully complied with the ESA and APA;

4.      Award the School District costs of litigation pursuant to 16 U.S.C. § 1540(g)(4) or, in the alternative, 28 U.S.C. § 2412; and

5.      Grant the School District an award of any additional relief that the Court deems just and proper under the circumstances of this case.

DATED:  April 1, 2022

                        Respectfully submitted,

                        NOSSAMAN LLP

By:      */s/ Paul S. Weiland*
         Paul S. Weiland (CA Bar No. 237058)
         pweiland@nossaman.com
         *Admitted to Practice in USDC, W.D. Tex.*
         NOSSAMAN LLP
         18101 Von Karman Avenue, Suite 1800

Irvine, CA 92612
Telephone:     949.833.7800
Facsimile:     949.833.7878

Rebecca Hays Barho (TX Bar No. 24055641)
rbarho@nossaman.com
NOSSAMAN LLP
816 Congress Avenue, Suite 970
Austin, TX  78701
Telephone:     512.651.0660
Facsimile:     512.651.0670

SMITH | ROBERTSON, LLP

By:      */s/ Wallace M. Smith*
Wallace M. Smith (TX Bar No. 18698200)
wsmith@smith-robertson.com
Alan M. Glen (TX Bar No. 08250100)
aglen@smith-robertson.com
1717West Sixth Street, Suite 295
Austin, TX 78703
Telephone:   512.225.5804
Facsimile:   512.225.5824

*Attorneys for Plaintiff*
*Leander Independent School District.*